IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 13, 2024 Session

## STATE OF TENNESSEE v. BRENT PAUL MOON

**Appeal from the Circuit Court for Coffee County**
**No. 45,016F    William A. Lockhart, Judge**

_____

### No. M2023-01192-CCA-R3-CD

_____

The Defendant, Brent Paul Moon, appeals the trial court's revocation of his effective three-year probationary sentence for felony evading arrest, simple possession of methamphetamine, and driving on a revoked license. On appeal, the Defendant argues that his right to a speedy trial was violated and, as such, the probation violation should be dismissed. Next, he contends that the trial court erred by admitting hearsay statements at the revocation hearing because no "good cause" existed for the statements' entry and that the statements were not reliable. Lastly, he claims the trial court erred by revoking his probation and running the revocation sentence consecutively to the sentence for his new criminal convictions. After review, we affirm the judgments of the trial court but remand for correction of a clerical error on the Defendant's judgment form for simple possession of methamphetamine.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed;**
**Case Remanded**

KYLE A. HIXSON, J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Drew Justice, Murfreesboro, Tennessee, for the appellant, Brent Paul Moon.

Jonathan Skrmetti, Attorney General and Reporter; Lacy E. Wilber, Senior Assistant Attorney General; Charles C. Northcott, District Attorney General; and Marcus Simmons, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## I.    FACTUAL AND PROCEDURAL HISTORY

### A.    Probation Violation

On August 29, 2018, the Defendant pled guilty in Coffee County Circuit Court to felony evading arrest, simple possession of methamphetamine, and driving on a revoked license. *See* Tenn. Code Ann. §§ 39-16-603(b); -17-418, -434; 55-50-504. He received an effective three-year sentence suspended to supervised probation after service of ninety days. These convictions were ordered to be served consecutively to Coffee County case number 17C-3171; however, the appellate record does not contain any information related to this case number.

Subsequently, the Defendant violated the conditions of his probation, and his probation was revoked twice, initially for 150 days and a second time for sixty days. After service of each of these periods of incarceration, he was released back to supervised probation.

On July 13, 2020, the instant violation of probation warrant issued, alleging, "Subject currently has an active warrant in Franklin County, TN. He is being charged with First Degree Murder." The warrant additionally alleged that the Defendant had failed to report and to make any payments toward his probation fees. The Defendant was arrested and incarcerated in Franklin County on these new charges, and nearly three years later, on January 10, 2023, the Defendant pled guilty to aggravated burglary and negligent homicide in the Franklin County case. Then, on April 25, 2023, he was served with the July 13, 2020 probation violation in this case.

On May 31, 2023, the Defendant filed a motion to dismiss the revocation warrant based on a violation of his right to a speedy trial. This motion, with an attached affidavit submitted and signed by defense counsel, detailed the events of the intervening years between the issuance of the violation warrant and the Defendant's motion to dismiss the warrant.

According to the affidavit, in August 2020, defense counsel was hired to represent the Defendant on the homicide case in Franklin County. Early in the representation, the Defendant said that he "assumed a probation violation [warrant] would be issued" in this case based upon the new Franklin County charges and that he would need defense counsel to represent him on the violation. After this conversation, defense counsel reviewed the Coffee County Circuit Court's website but did not find a probation violation warrant for

the Defendant. He then contacted the Coffee County Circuit Court Clerk's Office but was informed by the clerk assisting him that a warrant could not be located. Sometime later, defense counsel checked the website again but still did not see a probation violation.

Defense counsel negotiated a plea agreement in the Defendant's homicide case, but shortly before entering the plea agreement on January 10, 2023, the Defendant told defense counsel that he needed to be transferred to Coffee County Circuit Court to resolve what he believed to be a hold from a probation violation. Defense counsel informed the Defendant that he had not yet found any violation warrant.

Shortly after entering the plea agreement, defense counsel once again inquired about a probation violation and, at that time, learned a warrant had been issued against the Defendant on July 13, 2020. Defense counsel then "notified [the Coffee County Sheriff's Office] that [the Defendant] was located at the Franklin County Jail, and that [the Defendant] had an outstanding probation warrant from Coffee County that needed to be served." However, he was informed by "officials" at the jail that it was their policy not to serve such warrants until a defendant had fully served his time in the other county. After speaking with the Coffee County prosecutor, a transport order was entered directing that the Defendant be transported to Coffee County for the resolution of the probation violation.

B.      Speedy Trial Hearing

On June 7, 2023, a hearing was held on the Defendant's speedy trial motion. At the hearing, defense counsel presented no proof but argued that each of the four factors used in determining a speedy trial violation weighed in the Defendant's favor.

Regarding the first factor, the length of the delay, defense counsel argued that the warrant for this violation was not served until thirty-two months after its issuance and, during this time, the Defendant had been incarcerated in Tennessee. Defense counsel asserted that this delay was unreasonable and, when considering reduction credits, encompassed nearly the entire three-year sentence that was the subject of the probation violation. Relative to the second factor, the reason for the delay, he argued that the Coffee County Sheriff's Office had intentionally refused to serve the warrant and that the prosecutor and probation officer had been negligent in its service due to bureaucratic indifference. As to the third factor, defense counsel acknowledged that the Defendant did not assert his right to a speedy trial until around the time of the entry of his January 10, 2023 plea agreement, but argued that neither he nor the Defendant had notice of the warrant until such time.

- 3 -

As to notice of the violation, the trial court commented that the warrant had been entered into the "rule docket" upon its issuance. However, defense counsel insisted that, despite his efforts, he had been unable to locate the warrant until after the entry of the Franklin County plea agreement. Defense counsel additionally noted that he had inquired into whether a probation warrant had been issued against the Defendant "a couple of times over that first year after it had been issued[,]" but he was somehow misinformed that no warrant had issued. The trial court then inquired about the hold placed on the Defendant. Defense counsel stated that he did not know exactly when it was placed but that he was informed of it around the time the Franklin County plea agreement was entered. The State also acknowledged that it confirmed with "the jail" that a hold had been placed on the Defendant but did not know when such occurred.

Continuing with his argument regarding the fourth factor, defense counsel averred that the Defendant had suffered prejudice by the delay because, prior to the warrant's service, the Defendant had entered a "best interest" guilty plea in the homicide case and, therefore, was estopped from challenging the charged violation. Additionally, the Defendant would suffer prejudice regardless of whether his probation revocation was ordered to run concurrently or consecutively to his guilty-pled Franklin County convictions. If the Defendant received a concurrent sentence, he would still have lost three years' worth of pretrial jail credit, which was nearly equivalent to the entire probationary sentence. If he received a consecutive sentence, he was prejudiced because he would have been entitled to a concurrent sentence prior to the entry of his guilty plea. In so arguing, he acknowledged that the Franklin County judgments were silent as to the Coffee County sentence and that, when he had listened to the recording of the Franklin County guilty plea hearing, there was no mention of the Coffee County sentence.

While the State acknowledged that the delay had been nearly three years, it opposed the Defendant's assertion that the Coffee County Sheriff's Office had a policy of not serving warrants on incarcerated, out-of-county defendants. The prosecutor claimed that as soon as defense counsel notified him of the situation, he "didn't hesitate" to get the Defendant transported to Coffee County and served with the warrant. Additionally, he argued that the State had not been "sitting here on [its] hands the entire time[,]" as a hold had been placed on the Defendant.

The State continued its argument that the Defendant had acquiesced in the delay, noting that a more diligent effort would have uncovered the warrant. Similarly, the State argued that the Defendant had failed to timely assert his right to a speedy trial because the Defendant knew he was on probation in Coffee County and knew a hold was placed on him, yet he and his counsel neglected to act.

- 4 -

While the State agreed that the Defendant had entered a "best interest" guilty plea during the delay, it argued that the lost possibility of concurrent sentences was not necessarily sufficient to establish a speedy trial violation. It further noted that because the Franklin County judgments were silent as to the Coffee County sentence, pursuant to Tennessee Rule of Criminal Procedure 32, the newly-pled convictions were required to be served consecutively to the Coffee County sentence. As such, the Defendant could not be prejudiced by the trial court's ordering consecutive sentences because such a sentence was already required.

On June 16, 2023, the trial court entered a written order denying the Defendant's motion to dismiss the probation violation warrant for lack of a speedy trial. It found that the first three factors in its speedy trial analysis weighed in the Defendant's favor. As to the length of the delay, it found that the nearly three-year delay was presumptively unreasonable. Next, it found that while the reason for the delay did not rise to the level of intentional conduct, the main cause was the State's inaction and, as such, fell "squarely under bureaucratic indifference or neglect." For the third factor, the trial court found that the Defendant could not have asserted his right to a speedy trial until the violation warrant had been served, and once it had been served, the Defendant had timely asserted his right.

However, the trial court found that the prejudice factor did not weigh in the Defendant's favor. Regarding the Defendant's estoppel argument, the trial court determined, based on the State's concession, that the Defendant had entered a "best interest" guilty plea in the Franklin County homicide case. To address the Defendant's estoppel concerns, the trial court indicated that it would not view the guilty plea as dispositive in the violation hearing but rather require the State to prove that the Defendant had committed the new criminal conduct by a preponderance of the evidence, without reference to the convictions. Relative to the Defendant's loss of concurrent sentencing, the trial court found that the Defendant had failed to prove that circumstances absent the delay mandated a concurrent sentence. The trial court acknowledged that, had the warrant been timely served and the Defendant's probation revoked prior to entry of the plea agreement, consecutive sentencing could not be imposed pursuant to Tennessee Code Annotated section 40-35-310(a).[1] However, the Defendant still faced the possibility of consecutive sentences under other applicable law. Thus, the Defendant's receiving a concurrent sentence was merely hypothetical, not guaranteed. As to the loss of pretrial jail credits, the trial court found that the Defendant received credit for the time he was incarcerated on his

---

[1] Code section -310(a) authorizes the trial court to order the revocation sentence to run consecutively to the sentence for the underlying conduct if the conduct "resulted in a conviction against the defendant during the defendant's period of probation[.]"

Franklin County sentence.[2]  For these reasons, the trial court denied the Defendant's motion to dismiss the violation warrant.

## C.  Probation Violation Hearing

A probation revocation hearing was held on July 17, 2023.  Sandra Clark testified that on June 27, 2020, she lived with her boyfriend, James Eric Hanger, the victim in the Franklin County homicide case.  The Defendant arrived at their house that evening around 5:00 or 5:30 p.m. while Ms. Clark and the victim were in the back bedroom.  Ms. Clark observed the Defendant on the security camera and informed the victim of the Defendant's arrival.  The victim told Ms. Clark that the Defendant owed the victim money.  The victim then let the Defendant into the house and brought him to the back bedroom.  As Ms. Clark was preoccupied with downloading an application to her tablet, she was not paying attention to the victim and the Defendant's conversation.  However, Ms. Clark recalled that the Defendant asked whether his cousin could come inside, noting the outside heat.  The victim agreed, and when the Defendant returned, he brought two males with him.  Ms. Clark did not know these individuals, but they were later identified as codefendants Paul Fletcher and J'Shaun Myrick.

As the victim was counting money on the floor of the bedroom, the Defendant leaned against the doorframe of the bedroom while codefendant Myrick stayed in the hallway outside the bedroom, and codefendant Fletcher walked through the bedroom doorway.  As codefendant Fletcher entered the bedroom, he pulled a gun and put it to the back of the victim's head.  Codefendant Fletcher told the victim, "You're going to give me all that right there," and pointed to the money on the floor.  As the victim stood, codefendant Fletcher began to put the money into a bag, and the victim started to fight codefendant Fletcher.  Ms. Clark told the victim to let codefendant Fletcher have the money, but the fight continued.

At this point, codefendant Myrick entered the bedroom, slammed his fist on a dresser, and said, "Motherf----r, do you think we're playing with you?"  Codefendant Fletcher then pointed his gun at Ms. Clark and told the victim that if he did not stop fighting for the money, codefendant Fletcher would "blow" Ms. Clark's "brains out."  The victim "jumped" for the gun, and codefendant Fletcher shot the victim.  Codefendant Myrick helped codefendant Fletcher put the money into the bag.  At this point Ms. Clark noticed

---

[2] The Franklin County judgments were not included in the appellate record.  As such, we must presume the trial court's ruling in this respect is correct.  *See State v. Oody*, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (stating that in the absence of an adequate record on appeal, we presume that the trial court ruled correctly).

the Defendant was gone. Once the codefendants gathered the money, they ran from the house. Ms. Clark called 911, but the victim died in her arms.

While Ms. Clark acknowledged that the victim sold marijuana, she did not know whether he sold methamphetamine. Likewise, she did not know whether the Defendant was there to buy drugs or why the victim had money on the bedroom floor. She again reiterated that she had not been paying attention at first because she was on her tablet. While she acknowledged that "cousin" could be used as slang for "friend" or "homeboy," she believed the Defendant was trying to steal from the victim because he brought the codefendants into her and the victim's home.

At this time during the hearing, the State sought to introduce codefendants Fletcher's and Myrick's statements, which each had made during a "proffer" with the Franklin County District Attorney's Office in the Franklin County homicide case. Codefendants Fletcher and Myrick were brought before the trial court, along with their counsel. Because both codefendants had pending charges in Coffee County, they both refused to testify and invoked their Fifth Amendment right against self-incrimination. The trial court explained that they did not have a Fifth Amendment right as to the Franklin County homicide case because those charges had been resolved and, as such, the codefendants did not have any liberty interest at stake. It acknowledged, however, they both still had a Fifth Amendment right as to their newer, pending charges in Coffee County. Codefendant Fletcher's counsel interjected and stated that, as to codefendant Flecther, the resolved Franklin County case and the new Coffee County case were "interconnected" as codefendant Fletcher was on bail in Coffee County when the Franklin County incident occurred. Codefendant Fletcher's counsel commented that his client's testifying was "a bit too close for . . . comfort."

Despite the trial court's explanation, both codefendants still refused to testify, and the State sought to introduce their proffers through Investigator George Dyer who had worked on the case for the Franklin County Sheriff's Office. The State argued that "good cause" existed to deny the Defendant his right to confront and cross-examine the codefendants regarding their proffers because the codefendants were uncooperative and refused to testify. It further contended that the hearsay statements were reliable because they were made against self-interest, and the codefendants had been cautioned that their proffers could be used against them if found to be untrue. Defense counsel argued that simply refusing to testify did not constitute "good cause," that accomplices' statements were not reliable, and that if the proffers were admitted, then the Defendant would be denied the opportunity to rebut the evidence. The trial court agreed with the State's reasoning and allowed Investigator Dyer to testify regarding the codefendants' proffers.

Investigator Dyer testified that in June 2020, he was an investigator with the Franklin County Sheriff's Office and had been assigned to investigate the victim's murder. He affirmed the theory of the case was that the Defendant was criminally responsible for the robbery that resulted in the victim's death. Investigator Dyer acknowledged that the victim sold "harder" drugs than marijuana; he believed methamphetamine was recovered from the victim's residence. A few days after the incident, the Defendant was arrested and stated that he had not gone to the victim's house to kill anyone and that he had not wanted anyone to get hurt. Once the codefendants had been apprehended, both eventually agreed to give proffers to law enforcement. Investigator Dyer confirmed that prior to giving these proffers, both codefendants were informed that if the information were found to be untrue, it could be used against him in subsequent proceedings.

In his proffer, codefendant Myrick said that he, the Defendant, and codefendant Fletcher had met "a couple" times during which the Defendant had informed them that "he had someone who . . . wanted to hit a lick[.]" Investigator Dyer explained this was street slang for committing a robbery. After discussing it a few times, codefendant Myrick and codefendant Fletcher were "good with it[,]" and it then "went from there."

Initially, during codefendant Fletcher's proffer, he made claims which Investigator Dyer knew were untrue. However, codefendant Fletcher eventually gave information that corroborated the evidence and even admitted to shooting the victim after first denying doing so. As to the Defendant's involvement, codefendant Fletcher referenced a few meetings they had and stated that he and codefendant Myrick would not have known the victim had it not been for the Defendant.

Investigator Dyer stated the codefendants' proffers had been "very consistent" with one another but acknowledged on cross-examination that the proffers were not given on the same day and that he did not know whether the codefendants had access to each other's proffers. He also acknowledged that while the codefendants were both warned about giving false statements, they were also informed that true statements could be used to benefit their cases. Ultimately, both codefendants pled guilty to homicide and aggravated burglary.

During subsequent argument, defense counsel denied the Defendant was at the victim's house to rob or kill the victim. Rather, he stated that the Defendant was there to facilitate a drug deal between the victim and his codefendants for methamphetamine and to acquire marijuana for personal use. The trial court inquired whether the Defendant was admitting to facilitating an illegal drug transaction while on probation. Defense counsel affirmed this point several times and stated that while the Defendant may have violated probation in "other uncharged ways" and by missing "one or two appointments[,]" the

Defendant had not violated his probation by committing homicide, which was the conduct alleged in the violation warrant.

The trial court found that the Defendant had violated his probation by admitting to not reporting to probation, drug use, and facilitating an illegal drug transaction. It further found, based on Ms. Clark's testimony and the "basic facts" of the case, that the new criminal conduct had been proven by a preponderance of the evidence. Noting the criminal responsibility theory of the case, the trial court found that the Defendant had been inside the victim's residence when the "burglary/robbery/murder started" and had brought the codefendants who, absent the Defendant's involvement, did not have a reason to be at the victim's house, or a basis to be invited inside. As such, the "[w]orst case scenario" showed that the Defendant had aided his codefendants in the aggravated burglary. The trial court noted that it did not put "a lot of weight" on the codefendants' statements. The trial court then revoked the Defendant's three-year sentence in full.

During the parties' discussion regarding the alignment of the revocation to the Franklin County sentence, the trial court inquired whether the Franklin County judgments were silent as to this matter, noting if they were silent, consecutive sentences were automatic based on Tennessee Rule of Criminal Procedure 32. The State agreed, but the Defendant argued that Rule 32 was not applicable because probation was a "suspended" sentence not an "unserved sentence." To ensure the Defendant received a consecutive sentence, the State requested the trial court explicitly order consecutive sentences pursuant to Tennessee Code Annotated section 40-35-310(a). After reviewing the law, the trial court ordered the revocation be served consecutively to the Defendant's Franklin County sentence based on the statute referenced by the State. The trial court ordered that the Defendant receive "any credits that he's entitled to."

A revocation order to this effect was file stamped on July 19, 2023, and "recorded on minutes" on July 24, 2023. The revocation order stated the Defendant had violated the terms of his probation by "new criminal conduct while on Probation that resulted in conviction in Franklin County for Agg[ravated] Burglary [and] Negligent Homicide." On the order, a handwritten notation appeared reflecting the Defendant had pretrial jail credit from: "8-11-18—11-9-18 (90 days)[;] 7-27-19—11-14-19 (110 days)[;] 3-5-20—4-14-20 (40 days)[;] 4-25-23—7-17-23 (83 days)[.]" The Defendant filed a timely notice of appeal.

## II.    ANALYSIS

On appeal, the Defendant contends that his right to a speedy trial for his probation violation was violated and, as such, his probation violation should be dismissed. Additionally, he argues that the trial court erred by admitting hearsay statements at the

revocation hearing when no "good cause" existed for the statements' entry, and the statements were not reliable. Lastly, he claims the trial court erred by revoking his probation and running the revocation sentence consecutively to the sentence for his new criminal convictions. The State responds that the Defendant is not entitled to relief.

Following a further examination of the record and the issues presented, this court ordered supplemental briefing on the following issues:

(1) Given that defense counsel's affidavit of May 31, 2023, was not received into evidence as an exhibit at the hearing on the Defendant's speedy trial motion, may this court properly consider on appeal the facts stated in the affidavit?

(2) In light of *State v. Utley*, 956 S.W.2d 489 (Tenn. 1997), did the Defendant's speedy trial right attach at the time of the issuance of the violation of probation warrant, the placement of the hold on the Defendant while he was in Franklin County custody, the service of the warrant, or at some other time? Compare *State v. Tillery*, No. E2000-01996-CCA-R3-CD, 2001 WL 921754 (Tenn. Crim. App. Aug. 16, 2001) with *State v. Hutchings*, No. M2008-00814-CCA-R3-CD, 2009 WL 1676057 (Tenn. Crim. App. June 16, 2009).

(3) Who bears the burden of proof in a hearing on a speedy trial claim, and if it is initially the accused, does this burden shift once a showing is made that the delay was presumptively prejudicial?

### A. Consideration of the Affidavit

As to the affidavit issue regarding whether defense counsel's affidavit may be considered, the parties agree that despite its not being entered as an exhibit at the speedy trial hearing, this court may consider it. Tennessee Rule of Criminal Procedure 47 provides that "[a] motion may be supported by affidavit." Additionally, Tennessee Rule of Appellate Procedure 24 governs the content and preparation of the appellate record. Rule 24 directs that the record on appeal should consist of items including copies, certified by the clerk of the trial court, of all papers filed in the trial court except as otherwise provided. Tenn. R. App. P. 24(a). The purpose of the appellate record is to convey a fair, accurate, and complete account of what transpired with respect to those issues that form the bases of appeal. *Id.*

Appellate courts have previously refused to consider such documents when only included in the technical record and not formally entered as an exhibit. *See, e.g.*, *State v. Cooper*, 736 S.W.2d 125, 131 (Tenn. Crim. App. 1987) (first citing *Krause v. Taylor*, 583 S.W.2d 603, 605-06 (Tenn. 1979); and then citing *State v. Brock*, 678 S.W.2d 486, 489 (Tenn. Crim. App. 1984)). However, our supreme court has more recently allowed appellate consideration of items not formally entered as exhibits when properly filed with the trial court, included in the record and certified by the clerk, and which have also been reviewed and considered by the trial court. *See State v. Bobadilla*, 181 S.W.3d 641, 643-44 (Tenn. 2005) (holding appellate consideration was proper regarding a copy of a search warrant that was appended to the motion to suppress but not submitted into evidence); *see also State v. Simmons*, 54 S.W.3d 755, 761 & n.6 (Tenn. 2001) (rejecting the defendant's argument that the State's notice to seek enhanced punishment could not be considered when it was not properly put into evidence at the hearing on the motion to dismiss for lack of speedy trial because defense counsel did not object when the State mentioned it and relied upon it at the hearing); *State v. Housler*, 167 S.W.3d 294, 298 (Tenn. 2005) (holding that a transcript that had not been properly admitted into evidence but had been considered and relied upon by the trial court was reviewable by the appellate court under Tennessee Rule of Appellate Procedure 24(g) because it was "necessary to convey a fair, accurate and complete account of what transpired in the trial court with respect to those issues that are the bases of appeal").

Here, the affidavit was properly filed with the trial court prior to the hearing, referenced by both parties during arguments to the trial court at the speedy trial hearing without objection from the State, reviewed and considered by the trial court, and included in the appellate record and certified by the clerk. As such, we may properly consider it. However, we note that while the State did not object to the discussion of the affidavit during the hearing, several of the statements contained therein were based on hearsay from unnamed individuals and were disputed by the State. Neither party offered evidence as to the disputed statements in the affidavit, nor did the parties offer evidence regarding questions left unanswered by the affidavit, such as when the hold was lodged on the Defendant in Franklin County. While we agree with the parties in this instance that the affidavit may be considered on appeal, we do not wish to insinuate that defense counsel's affidavit conclusively establishes the facts contained therein, especially given that the affidavit contained hearsay and pertained to disputed facts. Often testimonial proof at evidentiary hearings is still needed and certainly would have been helpful given the circumstances of this case.

As the two remaining issues submitted by the court involve a defendant's right to a speedy trial, for clarity and to avoid repetition, we will address these issues below.

- 11 -

B.      Right to a Speedy Trial

The Sixth Amendment to the United States Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. VI. This provision applies to the states through the Fourteenth Amendment of the United States Constitution. *Klopfer v. North Carolina*, 386 U.S. 213, 223 (1967). Similarly, the Tennessee Constitution provides that "in all criminal prosecutions, the accused hath the right to . . . a speedy public trial[.]" Tenn. Const. art I, § 9. The right to a speedy trial is additionally guaranteed by statute which provides that "[i]n all criminal prosecutions, the accused is entitled to a speedy trial[.]" Tenn. Code Ann. § 40-14-101. The speedy trial right is designed to "protect the accused against oppressive pre-trial incarceration, the anxiety and concern due to unresolved criminal charges, and the risk that evidence will be lost or memories diminished." *Utley*, 956 S.W.2d at 492 (citing *Doggett v. United States*, 505 U.S. 647, 654 (1992)).

When addressing a speedy trial challenge, a reviewing court must conduct a balancing test to determine if a defendant's right was abridged. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972). The four factors to consider when conducting this balancing test are: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of the right; and (4) prejudice to the defendant. *Id.*; *State v. Bishop*, 493 S.W.2d 81, 83-84 (Tenn. 1973).

"[W]hen a court determines a defendant has been denied a constitutionally required speedy trial, the only relief the court can give is to dismiss what otherwise may be valid criminal charges." *Bishop*, 493 S.W.2d at 83; *see* Tenn. R. Crim. P. 48(b)(2). The question of whether a defendant's right to a speedy trial has been violated involves a mixed question of law and fact. *State v. Moon*, 644 S.W.3d 72, 78 (Tenn. 2022). Appellate courts should give deference to the trial court's findings of fact unless the evidence preponderates against them. *Id.* However, the trial court's interpretation and application of the law to the facts is reviewed de novo. *Id.*

The first factor, length of the delay, is a threshold factor, serving as the triggering mechanism "that will necessitate the consideration of the other three factors." *State v. Wood*, 924 S.W.2d 342, 346 (Tenn. 1996). Until the accused establishes a period of delay that is "presumptively prejudicial," there will be "no necessity for inquiry into the other factors that go into the balance." *Barker*, 407 U.S. at 530. Generally, "a delay must approach one year to trigger the *Barker* analysis," although "the line of demarcation depends on the nature of the case." *Utley*, 956 S.W.2d at 494; *see Doggett*, 505 U.S. at 652 n.1.

1.      When the Right Attaches

The Defendant argued in his supplemental brief that his speedy trial right attached when he became "accused," which occurred at the issuance of the probation revocation warrant.  Specifically, he argues that probation revocation proceedings are initiated by probation violation warrants, and thus, the issuance serves as the formal accusation.  To this point, he contends that *Allen v. State*, 505 S.W.2d 715 (Tenn. 1974), controls and asserts that our supreme court in *Utley* mistakenly held that the issuance of an arrest warrant was insufficient to attach the speedy trial right.  He bases his support for this claim on *Dickey v. Florida*, 398 U.S. 30, 32-35 (1970), in which, as he argues it, the United States Supreme Court provided that the issuance of an arrest warrant triggered the speedy trial right.  Additionally, he argues that, unlike unserved criminal indictments, probation violations are public records and that public scorn is one danger against which the speedy trial right provides protection.

The State counters that *Utley* is controlling and correctly held that, in the context of criminal charges, the issuance of an arrest warrant alone is not sufficient to trigger the right and that the speedy trial right is attached at arrest or upon formal grand jury action.  As such, the right to a speedy trial in probation revocation proceedings attaches at the time a defendant is served and arrested on the probation violation warrant.

By their terms, the above constitutional and statutory provisions apply to persons "accused" in "criminal prosecutions." *Simmons*, 54 S.W.3d at 758.  In *Gagnon v. Scarpelli*, 411 U.S. 778, 782 (1973), the United States Supreme Court, while discussing due process protections afforded to probationers in revocation proceedings, stated that a probation revocation was "not a stage of a criminal prosecution[.]"  The Court noted the "critical differences" between criminal trials and probation revocation hearings, reasoning that a probationer had already been convicted of a crime and therefore was entitled to less than the full panoply of due process rights accorded a defendant at a criminal trial.  *Id.* at 786-89.

However, one year after *Gagnon* was issued, the Tennessee Supreme Court in *Allen v. State* expressly held that a probation revocation proceeding was a continuation of the criminal prosecution and that the Tennessee Constitution "provides for a speedy trial in probation revocation proceedings[.]"  505 S.W.2d at 718-19.  While not mentioning the *Gagnon* opinion in its discussion, the *Allen* court reasoned that probation revocation proceedings were similar to criminal proceedings because "substantial rights of an accused may be affected." *Id.* at 718 (quoting *Fariss v. Tipps*, 463 S.W.2d 176, 179 (Tex. 1971)). The *Allen* court noted that in *Mempa v. Rhay*, 389 U.S. 128 (1967), the United States Supreme Court held that a probationer was entitled to counsel at the revocation of a

- 13 -

suspended sentence, indicating that revocation proceedings were a "critical stage of a criminal prosecution."[3]  *Allen*, 505 S.W.2d at 719.  The *Allen* court further explained that, as it had relied on criminal caselaw principles to conclude the issuance of a revocation warrant tolled the statute of limitations in probation revocation proceedings, it would be "totally inconsistent" to then say such revocation proceedings were "not a criminal prosecution or a continuation thereof."  *Id.* at 719.

Since *Gagnon*, the United States Supreme Court has cast doubt on whether the right to a speedy trial under the Sixth Amendment to the United States Constitution is applicable in probation revocation proceedings.  In *Carchman v. Nash*, the Court addressed the procedure utilized under Article III of the Interstate Agreement on Detainers ("the Agreement") by which a prisoner incarcerated in one state may demand the speedy disposition of a detainer lodged against him by another state.  473 U.S. 716, 729-30 (1985).  While the majority of the Court held that Article III did not apply to detainers based on probation violation charges, the Court again discussed the differences between criminal charges and probation violations.  *Id.* at 725-26, 734.  It reasoned that a probation violation charge did not accuse an individual of committing a criminal offense, initiate a prosecution, or bring a probationer to trial, but rather resulted in a hearing to determine whether the probationary conditions should be modified or whether the probationer should be resentenced.  *Id.* at 725-26.  While discussed in the context of the Agreement, the Court stated in a footnote that Congress had enacted the Agreement in part to vindicate a prisoner's right to a speedy trial.  *Id.* at 731 n.10.  The Court noted that it had never held that "a prisoner subject to a probation-violation detainer has a constitutional right to a speedy probation-revocation hearing[,]" thus, it was unclear whether "the purpose of vindicating a prisoner's constitutional right to a speedy trial [was] applicable at all in the context of probation-violation detainers."  *Id.*

Later, in *Betterman v. Montana*, the Court reviewed the issue of whether the speedy trial right applied to a post-conviction sentencing delay.  578 U.S. 437, 440-41 (2016).  The Court explained that criminal proceedings "unfold in three discrete phases."  *Id.* at 441.  The first phase involves investigation prior to arrest or indictment in which the individual is protected by statutes of limitations and due process safeguards; the second phase arises

---

[3] We note that, in *Gagnon*, the United States Supreme Court distinguished *Mempa*'s holding in that, in *Mempa*, the probationer was entitled to be represented by appointed counsel during a combined revocation and sentencing hearing because counsel was required "at every stage of a criminal proceeding where substantial rights of a criminal accused may be affected," and that sentencing was one such stage. *Gagnon*, 411 U.S. at 781 (quoting *Mempa*, 389 U.S. at 134).  However, *Gagnon* noted that "this line of reasoning does not require a hearing or counsel at the time of probation revocation in a case . . . where the probationer was sentenced at the time of trial." *Id.*  Thus, counsel must be provided at sentencing even when part of a subsequent probation revocation proceeding. *Id.*

after arrest or indictment through conviction, in which the speedy trial right "protects the presumptively innocent from long enduring unresolved criminal charges"; and the third phase falls between conviction and sentencing in which the individual is protected by limited due process rights and procedural statutes and rules. *Id.* at 441, 447-48. The majority of the Court expressly held that the right to a speedy trial detaches upon conviction. *Id.* at 441.[4]

Nonetheless, we are bound by our supreme court's decision in *Allen* that probationers undergoing revocation procedures are entitled to speedy trial protections under the Tennessee Constitution. However, the question arises over when the probationer becomes "accused." In *Allen*, the defendant was on probation for a third degree burglary charge when he was arrested and convicted of assault with intent to commit murder. 505 S.W.2d at 716. The day following his arrest for assault, a probation violation warrant was issued on the burglary case. *Id.* The State took no action for over two years, and due to pending parole possibilities on his assault conviction, the defendant inquired into the status of his burglary probation. *Id.* As a direct result of his inquiry, a probation violation hearing was set, and a detainer request was filed. *Id.* On the date of his probation violation hearing, two years and eight months after the issuance of the violation warrant, the defendant was served with the violation warrant. *Id.* The *Allen* court held that this two year and eight-month delay violated the defendant's right to a speedy trial on his probation revocation. *Id.* at 719. During its analysis, the *Allen* court did not mention *Barker*, which had been issued two years prior, or any of the *Barker* speedy trial factors. Moreover, the issue of when the speedy trial right attached was not directly addressed. The *Allen* court seemingly assumed, without discussion, that the defendant was accused at the issuance of the probation warrant and then generally concluded that the defendant had been prejudiced and his right to a speedy trial violated. 505 S.W.2d at 717-19. As such, the *Allen* court

---

[4] *See United States v. Taylor*, 931 F.2d 842, 848 (11th Cir. 1991) (explaining that the Sixth Amendment right to a speedy trial is not guaranteed to probationers); *United States v. Williams*, 558 F.2d 224, 226 (5th Cir. 1977) (noting same); *see also State v. Benjamin*, 929 A.2d 1276, 1280 n.2 (Vt. 2007) (noting that while the right to a speedy trial under the Sixth Amendment is not directly applicable in probation revocation proceedings, federal courts have used analogous logic embraced by due process protections to analyze delay in such proceedings); *United States v. Peguero*, 34 F.4th 143, 147 (2d Cir. 2022) (noting that revocation of supervised release is not a criminal prosecution triggering constitutional protections, including Sixth Amendment rights, afforded to a prosecution proceeding because it is a revocation of conditional liberty, like a revocation of probation, and need only comply with due process).

implied without expressly holding that the defendant became accused at the time of the issuance of the probation violation warrant.

Twenty-two years after the *Allen* decision, in *State v. Wood*, our supreme court discussed when a defendant faced with criminal charges becomes "accused" for speedy trial purposes. 924 S.W.2d at 345. The *Wood* court stated that to become "accused[,]" one must be faced with a "formal accusation." *Id.* Relying on *United States v. Marion*, it explained that "it is *either* a formal indictment *or* information *or* else the actual restraints imposed by arrest and holding to answer a criminal charge that engage the particular protections of the speedy trial provision of the Sixth Amendment." *Id.* (quoting *United States v. Marion*, 404 U.S. 307, 320 (1971)). One year later, our supreme court in *State v. Utley* squarely addressed what state action triggers a speedy trial analysis. 956 S.W.2d at 492. It determined that an arrest warrant alone did not trigger the analysis and reaffirmed the proposition from *Wood* that it is formal grand jury action or the actual restraint of an arrest which triggers the speedy trial right. *Id.* at 493; *see also State v. Baker*, 614 S.W.2d 352, 354 (Tenn. 1981) ("[N]o Sixth Amendment speedy trial problem arises until after formal accusation against the defendant, either by arrest or grand jury action."). The *Utley* court clarified that, under *Marion*'s reasoning, the significant interests served by the speedy trial right—the protection against oppressive pre-trial incarceration and the reduction of anxiety and concern caused by unresolved charges—are most directly implicated at the stages of an arrest or grand jury action. *Id.* at 493. Prior to these stages, a defendant's rights implicated by a delay in prosecution are protected by statutes of limitations and due process principles. *Id.* (citing *Baker*, 614 S.W.2d at 354).[5]

Since *Allen*, our supreme court has not revisited the speedy trial right in the context of probation revocation proceedings. As such, no clear guidance exists providing how the ruling from *Utley* should be applied in such situations. However, a panel of this court, in light of *Utley*, discussed at what point a probationer became "accused" for speedy trial purposes. *See State v. Tillery*, No. E2000-01996-CCA-R3-CD, 2001 WL 921754, at *2 (Tenn. Crim. App. Aug. 16, 2001). In a splintered opinion, Judge Wedemeyer wrote that it was the actual arrest for the probation violation which triggered the right. *Id.* He reasoned that while the *Allen* court determined a violation of the defendant's speedy trial

---

[5] As it relates to the Defendant's argument that the *Utley* court overlooked United States Supreme Court law to the contrary, the Defendant cites *Dickey* for support. However, *Dickey* involved a situation where the accused repeatedly demanded a speedy trial and was refused. *Dickey*, 398 U.S. at 32-35. The Court implicitly assumed the complaint, the arrest warrant, and the detainer lodged against the defendant were sufficient to constitute either formal accusation or arrest for the purposes of the Sixth Amendment. *Id.* at 36-38. However, as discussed, subsequent United States Supreme Court cases have explicitly held that the Sixth Amendment analysis is not triggered until the individual is arrested, otherwise detained, or indicted.

- 16 -

rights occurred due to the two-year and eight-month delay between the issuance of the warrant and revocation hearing, the *Utley* decision, which post-dated *Allen* by over two decades, "explicitly held 'that the issuance of an arrest warrant alone does not trigger a speedy trial analysis and that the right to a speedy trial is not implicated until there is an arrest or a formal grand jury accusation.'" *Id.* (quoting *Utley*, 956 S.W.2d at 491). Judge Wedemeyer explained that "[b]ecause there is no formal grand jury accusation in a probation revocation proceeding, it would appear that an actual arrest for the probation violation would be the triggering factor for a speedy trial right." *Id.* (first citing Tenn. Code Ann. § 40-35-311(b); and then citing *State v. Joyner*, No. 03C01-9701-CC-00036, 1998 WL 47878, at *2 (Tenn. Crim. App. Feb. 6, 1998)). Judge Wedemeyer noted that the defendant's main complaint over the delay from the issuance of the violation warrant and his return to answer for that warrant was addressed by due process safeguards. *Id.* at *3.

Judge Tipton concurred with the results but authored a separate opinion, disagreeing on when the defendant's right to a speedy trial attached.[6] *Id.* at *6. Judge Tipton noted that a detainer based upon the probation violation was previously lodged with the Tennessee Department of Correction and that the defendant's parole date was negatively impacted by the detainer. *Id.* As such, Judge Tipton posited that the defendant became accused when the detainer from this probation violation was lodged. *Id.*

Judge Wedemeyer's opinion in *Tillery* noted that at least two cases from this court had still applied *Allen* rather than *Utley* to probation violation proceedings. *See Tillery*, 2001 WL 921754, at *2 n.6. (collecting cases). Indeed, since *Tillery*, a majority of this court's opinions have continued to apply *Allen* for the proposition that the right to a speedy trial in a probation revocation proceeding attaches at the issuance of the warrant rather than at the arrest or restraints of an arrest. *See Hutchings*, 2009 WL 1676057, at *6 (collecting cases); *State v. McKee*, No. W2012-00797-CCA-R3-CD, 2013 WL 12181710, at *2 (Tenn. Crim. App. Mar. 7, 2013) (noting that "the prevailing view is that the length of delay is calculated from the issuance of the arrest warrant not when the defendant was taken into state custody"). The *Hutchings* court reasoned that *Utley* did not involve a speedy trial violation in the probation revocation context and thus concluded that *Allen* was still the prevailing law. *See id.* at *6. In holding that "the issuance of the warrant [was] the triggering mechanism[,]" the court further explained,

> It is precisely because there is no formal grand jury accusation in probation revocation proceedings, as opposed to a criminal charge, that we will not extrapolate the rationale from *Utley* to the present situation. Probation

---

[6] Judge Witt also concurred only in the results but did not author a separate opinion.

- 17 -

revocation proceedings are commenced when the trial judge issues the warrant; the warrant serves as the formal accusation.

*Id.* (citing Tenn. Code Ann. § 40-35-311(a)).

While acknowledging the minority nature of our view among prior decisions of this court, the reasoning in *Utley* alongside federal law in the context of criminal charges, leads us to agree more with the *Tillery* opinions that it is the arrest, restraint of an arrest, or indictment that makes an individual "accused," triggering the speedy trial right. We agree that the issuance of a probation violation warrant serves as a type of accusation. However, the *Utley* court reaffirmed that the formal accusation attaching the speedy trial right takes the form of grand jury action or an arrest. *Utley*, 956 S.W.2d at 492. As there is no grand jury action in a probation revocation proceeding, we decline to look for a substitute proceeding and instead apply the alternative triggering mechanism for the speedy trial right—the arrest or restraints of an arrest.

Additionally, we find applicable the reasoning espoused in *Utley* in the context of criminal charges that "the issuance of a warrant to commence the prosecution for the purpose of the statute of limitations but not trigger the right to a speedy trial is [not] 'manifestly unfair.'" *Id.* at 494. As *Utley* explained, the significant interests protected by the speedy trial right, namely oppressive pretrial incarceration and reduction in anxiety and concern caused by unresolved charges, are most directly implicated once a probationer is arrested for his probation violation warrant or when subject to the restraints caused by an arrest. *Id.* at 493 (citing *Marion*, 404 U.S. at 321-22). The stages prior to an arrest are protected by the statute of limitations and due process principles.[7] *Id.* (citing *Baker*, 614 S.W.2d at 354).

We also note that both *Tillery* and *Hutchings* draw support for their conclusions based on differing interpretations of Tennessee Code Annotated section 40-35-311, the statute governing probation revocation procedures. Code section 40-35-311(a)(1)(A) provides that when it comes to the attention of a trial court that a probationer has violated the conditions of probation, the trial court has the power to issue "[a] warrant for the arrest of the defendant as in any other criminal case." Further, subsection -311(b) provides that "[w]henever a person is arrested . . . for the violation of probation[,]" the trial court "shall, at the earliest practicable time, inquire into the charges and determine whether or not a violation has occurred[.]" We find further support here for our application of *Utley* over *Allen* in that the statute equates the issuance of a probation violation warrant to that of an

---

[7] While we acknowledge that there are no codified statutes of limitations in violation of probation proceedings, such proceedings may only be commenced within the applicable probationary period. *See* Tenn. Code Ann. § 40-35-311(a).

arrest warrant issued in a criminal case, which is not sufficient to trigger speedy trial protections. *See Utley*, 956 S.W.2d at 494. Additionally, subsection -311(b) seemingly vindicates the view that the speedy trial right attaches once the probationer is arrested for the revocation warrant—or otherwise under the restraints of an arrest—and not when the revocation warrant is issued.

### 2. Length of Delay

In his supplemental brief regarding the burden of proof for the threshold *Barker* factor, the Defendant argues that neither party shoulders the burden and that the length of the delay should be clear from the record. The State responds, citing *Doggett*, that the Court implicitly conveyed that it was the defendant who carries the initial burden to show that this threshold factor was met and that the delay was presumptively prejudicial, mandating consideration of the remaining factors. 505 U.S. at 652.

While we agree with the Defendant's argument to the extent that the length of the delay will generally be apparent from the record, if such is disputed or otherwise unclear, we conclude that it is the defendant who carries the initial burden to show the delay was presumptively prejudicial and establish this threshold factor. In *Doggett*, the United States Supreme Court noted that to simply trigger a speedy trial analysis,

> an accused must allege that the interval between accusation and trial has crossed the threshold dividing ordinary from 'presumptively prejudicial' delay, . . . since, by definition, he cannot complain that the government has denied him a 'speedy' trial if it has, in fact, prosecuted his case with customary promptness. *If the accused makes this showing*, the court must then consider, as one factor among several, the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim.

505 U.S. at 651-52 (emphasis added) (citations omitted). Moreover, this court in *State v. Easterly*, explained that "when an accused seeks the dismissal of a prosecution based upon the denial of the constitutional right to a speedy trial, *the accused must establish a period of delay that is 'presumptively prejudicial.'*" 77 S.W.3d 226, 235-36 (Tenn. Crim. App. 2001) (emphasis added) (using the later date for the triggering date when the record was unclear and noting that Tennessee Rule of Appellate Procedure 24(b) places the burden on the appellant to prepare an adequate record for appellate review), *abrogated on other grounds by Moon*, 644 S.W.3d at 78.

As explained above, in the instant case, we believe the incarcerated Defendant was, at the earliest, "accused" for speedy trial purposes once under the restraints of an arrest.

However, this record is silent as to a number of pertinent circumstances which would guide our analysis as to when such restraints occurred. While the record reflects that the Defendant was served with the probation violation warrant on April 25, 2023, no evidence was provided showing when a hold was lodged against the Defendant while he was incarcerated in Franklin County and what restraints, if any, were placed on the Defendant due to this hold. In the absence of this information, we consider the arrest date of April 25, 2023, to be the operative date for speedy trial purposes. *See id.* As such, we are unable to conclude that the less-than-three-month delay between this date and the revocation hearing was presumptively prejudicial. *Utley*, 956 S.W.2d at 494; *see Doggett*, 505 U.S. at 652 n.1. As the Defendant has failed to make the threshold showing, consideration of the remaining factors is unnecessary. *See Barker*, 407 U.S. at 530.

### C. Hearsay Statements

The Defendant argues that the trial court erred by admitting his codefendants' hearsay statements through Investigator Dyer. He contends that no "good cause" existed to deny the Defendant his right to confront his codefendants and that these proffers were not reliable. Additionally, in his reply brief, the Defendant questions the codefendants' "dubious" invocation of their right against self-incrimination. Although the Defendant acknowledges that the admission of these proffers may be harmless because the trial court placed little weight on the accusations, his argument, nonetheless, focuses on whether the trial court "found [the Defendant] guilty of the murder, as opposed to simply facilitating a drug deal[.]" To this point, he alleges that "accomplice hearsay is the only evidence directly tying [the Defendant] to any murder or burglary." As such, he contends that if we conclude the trial court found him "guilty" of murder, then the admission of his codefendants' proffers was prejudicial error. Alternatively, if we conclude that the trial court did not find him "guilty" of murder, he requests we conduct a de novo review of the evidence for the revocation and exclude any "erroneous accomplice hearsay" from our analysis.

The State responds that the trial court properly admitted the hearsay statements after finding good cause for denying the Defendant his right to confront the adverse witnesses and that their proffers were reliable. To this point, the State contends that "good cause" existed because the codefendants invoked their Fifth Amendment right against self-incrimination and that the proffers were reliable because they were made against self-interest and were consistent with the other evidence. Additionally, the State points out that the Defendant was able to thoroughly cross-examine Investigator Dyer about these proffers.

Hearsay is "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally not admissible. Tenn. R. Evid. 802. However, under Tennessee Rule of Evidence 804, statements of an unavailable witness may be admissible under some circumstances. A witness is unavailable when, as pertinent here, the witness is "exempted by ruling of the court on the grounds of privilege from testifying concerning the subject matter of the declarant's statement[.]" Tenn. R. Evid. 804(a)(1). Such privilege includes the Fifth Amendment right against self-incrimination. *See State v. Dotson*, 254 S.W.3d 378, 392-94 (Tenn. 2008); *Breeden v. Indep. Fire Ins. Co.*, 530 S.W.2d 769, 775 (Tenn. 1975). When a declarant is unavailable, the Rule against hearsay does not exclude "[a] statement which was at the time of its making . . . so far tended to subject the declarant to . . . criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true." Tenn. R. Evid. 804(b)(3).

However, "[s]trict rules of evidence do not apply at revocation hearings." *State v. Lewis*, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995). "Reliable hearsay has been held admissible in a probation revocation hearing so long as the defendant had a fair opportunity to rebut the evidence." *Lewis*, 917 S.W.2d 251, 257 (Tenn. Crim. App. 1995) (citing *State v. Carney*, 752 S.W.2d 513 (Tenn. Crim. App. 1988)).

"Intertwined with the rules on the admissibility of hearsay is the constitutional right to confront witnesses." *State v. Jones*, 568 S.W.3d 101, 128 (Tenn. 2019). The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause essentially ensures the right to physically face witnesses and the right to cross-examine witnesses. *State v. Lewis*, 235 S.W.3d 136, 142 (Tenn. 2007) (citation omitted). The Tennessee Constitution likewise guarantees the accused the opportunity "to meet the witnesses face to face." Tenn. Const. art. I, § 9.

As discussed above, the United States Supreme Court in *Gagnon* stated that a revocation of probation is not a stage of a criminal prosecution. *See Gagnon*, 411 U.S. at 782. As such, the full panoply of rights due a defendant in criminal prosecutions do not apply to probation revocations, and the right to confront witnesses may be relaxed under certain circumstances. *See State v. Wade*, 863 S.W.2d 406, 407-08 (Tenn. 1993) (first citing *Black v. Romano*, 471 U.S. 606, 613 (1985); and then citing *Bledsoe v. State*, 387 S.W.2d 811, 814 (Tenn. 1965)).

However, because a defendant has a liberty interest in the revocation proceedings, the defendant must be afforded due process. *See id.*; U.S. Const. amend. V, amend. XIV, § 1; *Gagnon*, 411 U.S. at 781. The minimum requirements of due process include

> (a) written notice of the claimed violations of (probation or) parole; (b) disclosure to the (probationer or) parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a "neutral and detached" hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking (probation or) parole.

*Gagnon*, 411 U.S. at 786 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 489 (1972)).

In accordance with principles of due process, a trial court may deny a probationer's right to confront adverse witnesses "upon a finding of good cause." *State v. Moss*, 13 S.W.3d 374, 386 (Tenn. Crim. App. 1999) (citing *Wade*, 863 S.W.2d at 408). As such, for hearsay evidence to be admissible at a probation revocation, the trial court must find that: (1) "good cause" exists to deny the defendant's right to confrontation; and (2) the hearsay evidence is reliable. *Wade*, 863 S.W.2d at 408. "Good cause is not a precise standard, and there is no bright-line rule for determining whether good cause exists." *State v. Dotson*, No. M2023-00430-CCA-R3-CD, 2024 WL 3027295, at *6 (Tenn. Crim. App. June 17, 2024) (citations omitted), *perm. app. denied* (Tenn. Nov. 14, 2024). In large part, this factually driven inquiry depends on the "nature and purpose of the evidence sought to be introduced" and, as such, testimony establishing grounds for revocation should be analyzed "more rigorously" as it provides grounds for depriving the defendant of his or her liberty interests. *Id.* (quoting *Miller v. Tenn. Bd. of Paroles*, No. 01A01-9806-CH-00293, 1999 WL 43263, at *5 (Tenn. Ct. App. Feb. 1, 1999)).

Here, while the Defendant suggests that his codefendants' invocation of their Fifth Amendment right was "dubious," no objection as to the validity of their claim was lodged with the trial court. *See* Tenn. R. App. P. 36(a); *see also State v. Smith*, 24 S.W.3d 274, 279-80 (Tenn. 2000) (explaining that when a party fails to object to the admissibility of hearsay evidence, the hearsay evidence becomes admissible notwithstanding any other Rule of Evidence to the contrary and may be considered and given its natural probative effect as if it were admissible). Additionally, this contention regarding the validity of the codefendants' invocations was asserted only in the Defendant's reply brief in what appears to be a response to the State's argument on this point. *See* Tenn. R. App. P. 27(c); *see also*

*Hughes v. Tenn. Bd. of Prob. & Parole*, 514 S.W.3d 707, 724 (Tenn. 2017) ("Issues raised for the first time in a reply brief are waived."); *Owens v. Owens*, 241 S.W.3d 478, 499 (Tenn. Ct. App. 2007) (stating a reply brief "is a response to the arguments of the appellee . . . [and] is not a vehicle for raising new issues."). As such, this particular argument is waived. Nonetheless, while we need not determine the validity of the codefendants' claim for our analysis, we note their pending charges in Coffee County show their assertion of the right was not untenable. *See generally Mitchell v. United States*, 526 U.S. 314, 326 (1999) (explaining the general principle that a criminal defendant has no valid basis to claim the right against self-incrimination is premised upon the theory that "there can be no further incrimination," *i.e.*, "the sentence has been fixed and the judgment of conviction has become final").

The record shows that the State procured the attendance of both codefendants at the revocation hearing, and it was brought to the attention of the trial court that both codefendants had pending charges in Coffee County. Moreover, according to codefendant Fletcher, the current case and his new charges were interconnected. While finding the codefendants did not have a Fifth Amendment right in the Franklin County case, as it had been resolved, the trial court noted the right was still intact for the pending charges. The codefendants, with the assistance of counsel, persisted in their refusals to testify, and based on these circumstances, the trial court specifically found good cause for the introduction of the codefendants' proffers through Investigator Dyer. Accordingly, we conclude good cause was established. *See, e.g.*, *State v. Cherry*, No. W2015-01084-CCA-R3-CD, 2016 WL 520304, at *3 (Tenn. Crim. App. Feb. 8, 2016) (affirming the trial court's implicit finding of good cause to justify the admission of hearsay statements when a subpoenaed declarant left the courthouse prior to the revocation proceeding); *State v. Hutcheson*, No. 01C01-9311-CC-00407, 1994 WL 456383, at *1 (Tenn. Crim. App. Aug. 23, 1994) (affirming determination that Junior College spokesperson's unwillingness to testify based on her fear of the defendant who was reportedly stalking two female students established good cause to admit "hearsay within hearsay" through the defendant's probation officer).

Furthermore, the trial court made a specific finding that the codefendants' proffers were reliable. While the Defendant challenges these proffers based on their initial inconsistencies, their being made in self-interest, and their being made by accomplices, the trial court was aware of these facts, many of which were adduced through the cross-examination of Investigator Dyer. *See* Tenn. Code Ann. § 40-35-209(b); *Lewis*, 917 S.W.2d at 257 (providing that reliable hearsay is admissible in a probation revocation if the opposing party has a fair opportunity to rebut the evidence). Additionally, the codefendants' proffers were made against their penal interest, with codefendant Fletcher's statements providing he was the shooter. It is a well-recognized hearsay exception that hearsay statements made against penal interest are reliable and admissible when the

declarant has refused to testify based on the right against self-incrimination. *See* Tenn. R. Evid. 804(b)(3); *Dotson*, 254 S.W.3d at 392-94; *Breeden*, 530 S.W.2d at 775. As such, we cannot conclude the Defendant was denied due process by the admission of these proffers.

However, even assuming these statements were admitted in error, we cannot conclude that the Defendant suffered prejudice as a result. A trial court need not find a defendant "guilty" of violating his probation, as the Defendant phrases it, but must determine by a preponderance of the evidence whether a violation has occurred. *See* Tenn. Code Ann. § 40-35-311(d)(1). The trial court put little weight on the codefendants' statements, and contrary to the Defendant's assertion, the hearsay statements were not the only evidence tying him to the new criminal conduct. No party contested the basic facts of the Franklin County case, namely that the victim was killed as a result of the Defendant's involvement with the codefendants at the victim's house. Additionally, Ms. Clark's testimony described a robbery resulting in the victim's murder, and Investigator Dyer testified that the theory in the Defendant's case was criminal responsibility. Noting this evidence, the trial court found that a violation of probation had occurred. Thus, even if the trial court's admission of the codefendants' proffers was error, it would be harmless. *See generally Chapman v. California*, 386 U.S. 18, 24 (1967); *State v. Vaughn*, 144 S.W.3d 391, 409 (Tenn. Crim. App. 2003); *see also* Tenn. R. App. P. 36(b). As such, the Defendant is not entitled to relief on this issue.

### D. Probation Revocation Decision

The Defendant argues that the trial court abused its discretion when it revoked his probation and imposed consecutive sentences pursuant to Tennessee Code Annotated section 40-35-310(a) yet failed to expressly find him "guilty of the new charge" of homicide. As to this point, the Defendant contends that Tennessee Code Annotated section 40-35-310(a) only allowed the trial court to consecutively align his Coffee County sentences to his new Franklin County convictions if the trial court found him "guilty" of the charged conduct of homicide. He stated that while "everyone agrees" the Defendant violated his probation "at least in some technical way" and by committing "some new criminal conduct[,]" the trial court made "no conscientious ruling" as to the homicide allegation in the warrant and "expressly found that [the Defendant] may be innocent of the murderous conduct[.]"

The State responds that the trial court acted within its discretion by revoking the Defendant's probation and ordering consecutive sentences because it found by a preponderance of the evidence that the Defendant had committed the "new criminal conduct" which included murder by criminal responsibility.

- 24 -

Appellate courts review a trial court's revocation of probation decision for an abuse of discretion with a presumption of reasonableness "so long as the trial court places sufficient findings and the reasons for its decisions as to the revocation and the consequence on the record." *State v. Dagnan*, 641 S.W.3d 751, 759 (Tenn. 2022). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010). If a trial court fails to state its findings and reasoning for the revocation on the record, appellate courts may conduct a de novo review if the record is sufficiently developed, or the appellate court may remand the case for the trial court to make such findings. *Dagnan*, 641 S.W.3d at 759 (citing *State v. King*, 432 S.W.3d 316, 324 (Tenn. 2014)).

Probation revocation is a two-step consideration requiring trial courts to make two distinct determinations as to (1) whether to revoke probation and (2) what consequences will apply upon revocation. *Dagnan*, 641 S.W.3d at 757. No additional hearing is required for trial courts to determine the proper consequences for a revocation. *Id.* The trial court's findings do not need to be "particularly lengthy or detailed but only sufficient for the appellate court to conduct a meaningful review of the revocation decision." *Id.* at 759 (citing *State v. Bise*, 380 S.W.3d 682, 705-06 (Tenn. 2021)).

"The trial judge may enter judgment upon the question of the charges as the trial judge may deem right and proper under the evidence adduced before the trial judge." Tenn. Code Ann. § 40-35-311(d)(1). "If the trial judge finds by a preponderance of the evidence that the defendant has violated the conditions of probation and suspension of sentence, then the court may revoke the defendant's probation and suspension of sentence, in full or in part, pursuant to [section] 40-35-310." *Id*. Notwithstanding subdivision (d)(1), the probation statute provides for two categories of probation violations, technical and non-technical, with differing penalties for both. *State v. Walden*, No. M2022-00255-CCA-R3-CD, 2022 WL 17730431, at *3 (Tenn. Crim. App. Dec. 16, 2022).

A trial court may not revoke a defendant's probation and suspension of sentence for a felony offense, temporarily or otherwise, based upon one instance of a technical violation. Tenn. Code Ann. § 40-35-311(d)(2). For a second or subsequent technical violation, a trial court may revoke a defendant's probation and suspension of sentence for a felony offense and impose a temporary term of incarceration not to exceed: (1) fifteen days for a first revocation, (2) thirty days for a second revocation, (3) ninety days for a third revocation, or (4) the remainder of the sentence for a fourth or subsequent revocation. *Id*. § -311(e)(1)(A). Alternatively, upon a second or subsequent technical violation, a trial court may revoke a defendant's probation and resentence a defendant to a term of probation

that includes participation in community-based alternatives to incarceration. *Id.* § -311(e)(1)(B).

The following are classified as non-technical violations: a defendant's commission of a new felony or a new Class A misdemeanor, a zero tolerance violation as defined by the department of correction community supervision matrix, absconding, or contacting the defendant's victim in violation of a condition of probation. Tenn. Code Ann. § 40-35-311(e)(2). Once a trial court determines that a defendant has committed a non-technical violation of probation, the trial court may: (1) order confinement for some period of time; (2) cause execution of the sentence as it was originally entered; (3) extend the defendant's probationary period not exceeding one year; (4) return the defendant to probation on appropriate modified conditions; or (5) resentence the defendant for the remainder of the unexpired term to a sentence of probation. *See id.* §§ -308(c); -310; -311(e)(2).

In the instant case, the trial court determined the Defendant had violated his probation and expressly found that the new criminal conduct had been proven by a preponderance of the evidence. In its findings, the trial court noted that the Defendant's admission, the "basic facts" of the case, and Ms. Clark's testimony factored into its decision. It noted that the theory of the State's case was criminal responsibility and that the Defendant's involvement with his codefendants at the victim's house resulted in the victim's death. While the Defendant only admitted to being present to facilitate a drug transaction, Ms. Clark described a robbery and testified to her belief that the Defendant was there to steal from the victim. *See Bledsoe*, 387 S.W.2d at 560 (explaining in probation revocation hearings, the credibility of witnesses is for the trial court's determination, as it is in the best position to observe witness demeanor); *see also State v. Chandler*, No. E2020-01409-CCA-R3-CD, 2021 WL 5119167, at *3 (Tenn. Crim. App. Nov. 4, 2021) (citing *State v. Delp*, 614 S.W.2d 395, 397-98 (Tenn. Crim. App. 1980)) (stating that "[t]he trial court is free to exercise its judgment based on the proof in the record supporting a new criminal offense"). As such, the trial court did not abuse its discretion revoking the Defendant's probation and ordering him to serve the sentence in full in the Tennessee Department of Correction. *See* Tenn. Code Ann. § 40-35-310; -311(d)(1), (e)(2); *Dagnan*, 641 S.W.3d at 757-59.

Additionally, we do not agree with the Defendant that a trial court "must expressly find the probationer guilty of the new charge" alleged in the probation violation warrant to impose consecutive sentences pursuant to Code section -310(a). As noted above, a trial court need not find a defendant "guilty" of violating his probation, as the Defendant phrases it, but must determine by a preponderance of the evidence whether a violation has occurred. *See* Tenn. Code Ann. § 40-35-311(d)(1). The Defendant does not provide any caselaw,

and we know of none that supports a more a restrictive reading. Code section -310(a) provides only that, if a trial court revokes a defendant's probation due to conduct by the defendant that resulted in a conviction while on probation, then the trial court may impose consecutive sentencing of the term of imprisonment imposed by the original judgment to any sentence resulting from that conviction. *See id.* § 310(a); *see also State v. Moore*, 942 S.W.2d 570, 573-74 (Tenn. Crim. App. 1996) (explaining the application of this section is appropriate where a defendant is convicted of a crime while on probation for a previous conviction). Such is the case here.

### E. Correction of Clerical Error

We note that the Defendant's judgment form in count 1 of the underlying indictment for his conviction for simple possession of methamphetamine shows him receiving an eleven-year and twenty-nine-month sentence. We conclude that this is a clerical error which should reflect that the Defendant was sentenced to eleven *months* and twenty-nine *days* for his Class A misdemeanor conviction. *See* Tenn. Code Ann. §§ 39-17-434(b), (e)(2), -418(c)(1); 40-35-111(e)(1). On remand, the trial court is directed to enter a corrected judgment form to reflect that the Defendant received an eleven-month and twenty-nine-day sentence for this offense.

### III. CONCLUSION

In consideration of these principles, we affirm the judgments of the trial court but remand for the entry of a corrected judgment form for the Defendant's conviction in count 1 for simple possession of methamphetamine.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE